# IN THE SUPREME COURT OF TEXAS

════════════
No. 15-0139
════════════

IN RE STATE OF TEXAS, RELATOR

═══════════════════════════════════════════════
ON PETITION FOR WRIT OF MANDAMUS
═══════════════════════════════════════════════

JUSTICE BROWN, joined by JUSTICE DEVINE, concurring in the dismissal of the petition for writ of mandamus.

In a span of less than three hours on February 19, 2015, the lawyer for the real parties in interest, Sarah Goodfriend and Suzanne Bryant, accomplished quite a lot:

- He filed a lawsuit challenging the constitutionality of provisions in the Texas Constitution and Texas Family Code stating that marriage in Texas can only be between one man and one woman;

- He obtained a temporary restraining order in the same civil lawsuit—from a district judge who usually hears only criminal cases, with no notice to the Attorney General, and facing, at best, token opposition from the Travis County Attorney's office—which allowed his clients to obtain a marriage license from the Travis County Clerk;

- He obtained for his clients a waiver of the Texas Family Code's mandatory 72-hour waiting period between the issuance of a marriage license and the performance of a marriage ceremony; and

- To avoid intervention by the Attorney General or appellate review, he nonsuited the lawsuit following his clients' marriage ceremony on the courthouse steps.

Despite the nonsuit, the Attorney General filed a petition for writ of mandamus the next day challenging the validity of the trial court's order.

Today this Court dismisses that mandamus petition as moot. In light of the United States Supreme Court's 5-4 decision in *Obergefell v. Hodges*,[1] I cannot dispute this disposition. But the fact remains that the temporary restraining order was a deliberate and premeditated misuse of the Texas justice system—and that I cannot overlook.

Anyone with elementary knowledge of Texas civil procedure knows that "[t]he purpose of a TRO is to preserve the status quo."[2] In any given case, the status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy."[3] In this case, the status quo was that marriage in Texas was limited to the union of one man and one woman. So says the Texas Constitution, the Texas Family Code, and Texas common law.[4] Indeed, so says all of pre-21st-century American history and all of Western Civilization from the beginning of Christendom to the modern day.[5] More pointedly, at the time the TRO in this case was requested and granted, no court

---

[1] ___ U.S. ___, 135 S. Ct. 2584 (2015).

[2] *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).

[3] *Id.* (internal quotation marks omitted).

[4] *See* TEX. CONST. art. I, § 32; TEX. FAM. CODE §§ 2.001, 6.204; *Grigsby v. Reib*, 153 S.W. 1124, 1130 (Tex. 1913) ("Marriage is not a contract, but a status created by mutual consent of one man and one woman.").

[5] In his dissenting opinion in *Obergefell*, Justice Antonin Scalia noted that from the time of its ratification until this century, the Fourteenth Amendment had never been thought to grant a right to same-sex marriage:

with any precedential authority over any Texas state court had altered that status quo. Both the lawyer seeking the TRO and the judge who granted it knew and ignored this fact.

It is also fundamental that a trial court abuses its discretion when it makes a final adjudication in a TRO.[6] It's right there in the title—*temporary* restraining order. TROs may be obtained ex parte, with little to no notice to the opposing side, and in a non-evidentiary hearing precisely because the law intends for them only to preserve the status quo until the trial court convenes a properly noticed, adversarial, and evidentiary hearing on the injunctive relief the plaintiff seeks.[7] Texas law should not

When the Fourteenth Amendment was ratified in 1868, every State limited marriage to one man and one woman, and no one doubted the constitutionality of doing so. That resolves these cases. When it comes to determining the meaning of a vague constitutional provision—such as "due process of law" or "equal protection of the laws"—it is unquestionable that the People who ratified that provision did not understand it to prohibit a practice that remained both universal and uncontroversial in the years after ratification. We have no basis for striking down a practice that is not expressly prohibited by the Fourteenth Amendment's text, and that bears the endorsement of a long tradition of open, widespread, and unchallenged use dating back to the Amendment's ratification. . . . The five Justices who compose today's majority are entirely comfortable concluding that every State violated the Constitution for all of the 135 years between the Fourteenth Amendment's ratification and Massachusetts' permitting of same-sex marriages in 2003. They have discovered in the Fourteenth Amendment a "fundamental right" overlooked by every person alive at the time of ratification, and almost everyone else in the time since. They see what lesser legal minds—minds like Thomas Cooley, John Marshall Harlan, Oliver Wendell Holmes, Jr., Learned Hand, Louis Brandeis, William Howard Taft, Benjamin Cardozo, Hugo Black, Felix Frankfurter, Robert Jackson, and Henry Friendly—could not. They are certain that the People ratified the Fourteenth Amendment to bestow on them the power to remove questions from the democratic process when that is called for by their "reasoned judgment." These Justices *know* that limiting marriage to one man and one woman is contrary to reason; they *know* that an institution as old as government itself, and accepted by every nation in history until 15 years ago, cannot possibly be supported by anything other than ignorance or bigotry. And they are willing to say that any citizen who does not agree with that, who adheres to what was, until 15 years ago, the unanimous judgment of all generations and all societies, stands against the Constitution.

*Obergefell*, 135 S. Ct. at 2628, 2629–30 (Scalia, J., dissenting) (emphasis in original).

[6] *See Newton*, 146 S.W.3d at 652; *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 590 (Tex. 1962) (per curiam).

[7] *See* TEX. R. CIV. P. 680; *Houston Belt & Terminal Ry. Co. v. Tex. & N. O. R. Co.*, 289 S.W.2d 217, 219 (Tex. 1956).

be declared unconstitutional "based merely on pleadings and a brief, non-evidentiary TRO hearing when substantial rights are involved and the issues are far from clear."[8] Yet that's exactly what happened here. The TRO provided the real parties in interest all of the relief they sought. After a short hearing during which no testimony or other evidence was received—in which no court reporter's record was even taken—the trial court declared Texas marriage law unconstitutional and authorized a union explicitly prohibited under Texas law. Then, once the marriage ceremony was complete, the couple's lawyer quickly nonsuited the case.[9]

Counsel followed up this suborned abuse of discretion by bragging to the news media that neither the Attorney General nor this Court could do anything about it. "We got our people married," he told one newspaper.[10] Dismissing this mandamus action as an improper end run around court procedure, he further insisted that the Attorney General "can't retroactively undo a marriage by saying the order was not valid. There is no procedure for that."[11] The Attorney General's challenge to the TRO, he maintained, has "no practical meaning."[12]

---

[8] *Newton*, 146 S.W.3d at 651.

[9] *See Epps v. Fowler*, 351 S.W.3d 862, 870 (Tex. 2011) (disfavoring "nonsuits that are filed to circumvent unfavorable legal restrictions or rulings"). After exchanging vows, Bryant reportedly said: "Let's get back in (to register the marriage) before they make it illegal!" Chuck Lindell, *First Gay Marriage in Texas*, AUSTIN AMERICAN-STATESMAN, Feb. 20, 2015, at A1.

[10] Chuck Lindell, *'I've Got It': With License in Hand, Pair Make History in Joyful Rush*, AUSTIN AMERICAN-STATESMAN, Feb. 20, 2015, at A1.

[11] Chuck Lindell, *Paxton: Gay Marriage Won't Stand; Attorney General Says License Issued by Travis Clerk Illegal, Invalid*, AUSTIN AMERICAN-STATESMAN, Feb. 21, 2015, at A1.

[12] Lindell, *'I've Got It'*, *supra* note 10, at A1.

These comments paired with the conduct he exhibited in this litigation make this fact obvious: the lawyer for the real parties in interest intentionally and illegitimately gamed the system—and the trial court helped him do it. Neither zealous advocacy on behalf of one's clients nor a desire to be on "the right side of history" is an excuse for cynically manipulating a system that necessarily relies on the bench's and bar's high regard for the law. The ends do not justify the means.

Members of the legal profession have agreed to live under rules proclaiming that it is "a lawyer's duty to uphold legal process," that "[a] lawyer's conduct should conform to the requirements of the law," and that "[a] lawyer should demonstrate respect for the legal system and for those who serve it . . . ."[13] The continued viability of the rule of law depends on the bench and bar adhering faithfully to these obligations. To do otherwise impugns the integrity of our judicial institutions and undermines the public's trust in their objectivity and reliability.

As judges and lawyers, we bear a sacred obligation to uphold the rule of law even when the law does not conform to what we believe it should be. That duty includes withstanding the temptation to bend and abuse legal process to collect an earnestly desired result the law simply does not provide. Those who underhandedly indulge that temptation dishonor both our profession and the rule of law.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: April 15, 2016

---

[13] TEX. RULES DISCIPLINARY P. pmbl. ¶ 4.

5